UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    CRIM. NO. 14-113(JNE/JSM)

      Plaintiff,                         REPORT AND RECOMMENDATION

v.

RICARDO GARCIA-GARZA,

      Defendant.

The above matter came before the undersigned on defendant Ricardo Garcia-Garza's Motion to Suppress Physical Evidence [Docket No. 17].  Clifford Wardlaw, Esq. Assistant U.S. Attorney appeared on behalf of the Government.  James S. Becker, Esq. appeared on behalf of defendant, who was personally present.  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

Defendant has been indicted on one count of Illegal Re-entry of a Removed Alien.  Indictment [Docket No. 8].  Defendant moved to suppress physical evidence seized from defendant based on an illegal search and seizure.  This Court conducted an evidentiary hearing, received evidence and took testimony from Officer Michael Nelson of the Minneapolis Police Department, who conducted the seizure.

I.      **BACKGROUND**

    A.    <u>**Hearing Testimony**</u>

Minneapolis police officer Michael Nelson testified that on March 21, 2014, at approximately 11:38 p.m., he and his partner Officer William Martin received a call regarding a suspicious person at 2425 18th Ave. South in Minneapolis.  (Tr. 12). Neither a physical description nor the gender of the suspicious person was provided.

(Tr. 13, 22).  Officer Nelson was familiar with the address—it is part of the Little Earth Housing Development, a densely populated, high crime area, which hires off-duty officers to provide security on a continuous basis.  (Tr. 12-13).  Numerous police calls are received daily from the Little Earth complex.  (Tr. 13).

Upon arriving at the address, the officers unsuccessfully attempted to contact the original caller for a description of the suspicious person.  (Id.).  The officers pulled into the location given by the dispatcher and found one person (defendant) in the parking lot. (Tr. 14-15).  The officers approached defendant, assuming that whoever it was, there was a likelihood that he was the basis for the "suspicious person" call.  (Tr. 14).  When the officers approached the defendant, he was taking garbage to a dumpster.  (Id.).

The officers were in uniform and had their firearms holstered when they approached the defendant, with whom they had a brief conversation, trying to determine who he was and if he had a legitimate reason to be in the parking lot.  (Tr. 13-15). Officer Nelson also testified that he sought to determine defendant's identity as he could be a witness.  (Tr. 32).  The officers did not restrain defendant.  (Tr. 15).  Officer Nelson attempted to identify defendant to determine if he lived in the neighborhood, which Officer Nelson explained was "common practice."  (Id.).  Officer Nelson further testified that due to the high crime area, "it was good standard practice" to attempt to identify the person.  (Id.).  Officer Nelson stated that defendant appeared to be nervous, found his nervousness to be "unusual," and noted it in his police report.  (Tr. 15, 30).  When asked for his name, defendant gave the name of Jose Soto.  (Tr. 15-16).  Officer Nelson asked defendant for identification, and he said that he had none.  (Tr. 15).  Officer Nelson testified that based on his training and experience he knew that people generally carried

identification in their wallets, and when he asked defendant if he had a wallet, defendant said he did not.  (Tr. 16).  But Officer Nelson could see that defendant had a wallet in his back pants pocket and had a strong suspicion that defendant had identification in his wallet.  (Id.).  Officer Nelson testified that it is a misdemeanor or gross misdemeanor in Minnesota to give a police officer a false name.  (Id.).

Officer Nelson testified that at some point "we did recover" the wallet from defendant and found identification in it, which stated that defendant was "Jose Soto." (Tr. 16-17, 31; Def. Ex. 1 at p. 000675) (police report stating that Officer Nelson "retrieved" the wallet from defendant's pants pocket and that "the Id stated [defendant's] name was Jose Soto.").

Officer Martin left to attempt to identify "Soto," returned and questioned defendant again about his identity.  (Tr. 17).  "And then the name German Valenzuela[1] was run for identification purposes," defendant was asked if his name was German Valenzuela, and defendant replied that it was.  (Tr. 17-18).  Officer Martin ran this name through his computer system and discovered an outstanding warrant for defendant's arrest for a ticket.  (Tr. 18; Def. Ex. 1 at p. 000675).  Defendant was arrested and taken to the Hennepin County Jail.  (Tr. 18-19).

On cross-examination, Officer Nelson testified that in addition to not knowing the suspect's physical description and gender, he and Officer Martin did not know the reason for the phone call to police of a suspicious person, and dispatch was unable to contact the caller to obtain more information.  (Tr. 20-24).  Officer Nelson denied that they "were going to stop anyone and everyone . . . who might be suspicious, in [their]

---

[1]     The indictment lists Jose Soto and Jose German Valenzuela as aliases used by defendant.  Indictment, p. 1 [Docket No. 8].

opinion;" rather their job was to respond to the call and make an assessment of the situation. (Tr. 21). While Officer Nelson could recall that the wallet was in defendant's pants pocket, as this was documented in his report, he could not recall which pocket or what defendant was wearing. (Tr. 28). Officer Nelson believed that defendant's nervousness was "appropriate for someone who had a warrant for their arrest." (Tr. 30).

### B.   Defendant's Motion to Suppress and Government's Response

Defendant contended that (1) the search and seizure of him was without reasonable, articulable suspicion pursuant to Terry v. Ohio, 392 U.S. 1 (1968), which was the only basis on which the detention and search could be justified; and (2) any physical evidence (presumably his wallet) obtained during the course of the illegal search had to be suppressed based on the "fruit of the poisonous tree" doctrine.[2] Defendant's Memorandum in Support of Pretrial Motions ("Def's. Mem."), pp. 1, 3, 6 [Docket No. 23]. Defendant maintained that the officers were, at best, acting on a "hunch" when they stopped him, and his alleged "nervousness" was reasonable in light of the fact that he was taking out the trash in a high crime area when he was "unexpectedly approached by two men emerging from an alleyway." Id., p. 5.

The Government argued that the initial meeting between defendant and the officers was a consensual encounter during which the officers asked for identification. Government's Memorandum of Law in Response to Motion to Suppress ("Gov't Mem."), pp. 2-6 [Docket No. 26]. In a consensual encounter, if a reasonable person would feel free to terminate the encounter, then he or she has not been seized. Id., p. 3 (citing United States v. Drayton, 536 U.S. 194, 200 (2002)). The Government likened the facts

---

[2]   Defendant has moved only to suppress physical evidence, not statements defendant made to police officers during his encounter with them.

and circumstances of this case to those present in <u>United States v. Flores-Sandoval</u>, 474 F.3d 1142 (8th Cir. 2007).  There, an immigration agent approached Flores-Sandoval on a public sidewalk and asked him about his immigration status.  <u>Id</u>. at 1144.  Flores-Sandoval admitted that he was in the United States illegally and he was taken into custody.  <u>Id</u>.  When he was fingerprinted, it was discovered that Flores-Sandoval had previously been deported.  <u>Id</u>.  Flores-Sandoval moved to suppress his statements to the immigration agent and his fingerprints.  The Eighth Circuit held the encounter was consensual and concluded that the encounter did not violate the Fourth Amendment.  <u>Id</u>.  The Government urged the same result here, arguing that the initial encounter between defendant and the officers was consensual, took place in a public parking lot, and defendant was not restrained.  <u>Id</u>., p. 3.  Then, when defendant admitted that he had given a false name to the officers, they had the right to convert the initial consensual encounter to a <u>Terry</u> stop.  <u>Id</u>., pp. 3-4.  Finally, upon learning of the outstanding warrant for his arrest based on his name, the officers had probable cause for defendant's arrest, and once he was arrested, he could be searched.  <u>Id</u>., p. 5 (citing <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973); <u>United States v. Brewer</u>, 624 F. 3d 900, 906 (8th Cir. 2010)).  At that point, "[h]is wallet and then the contents of the wallet would have been seized by the police."  <u>Id</u>.  (citing <u>Nix v. Williams</u>, 467 U.S. 431 (1984)).

## II.    DISCUSSION

The Eighth Circuit has described three categories of police encounters: "(1) consensual communications involving no coercion or restraint, (2) <u>Terry</u> stops— minimally intrusive seizures significant enough to invoke the Fourth Amendment and

which must be supported by reasonable suspicion, and (3) full-scale arrests that must

be supported by probable cause." Flores-Sandoval, 474 F.3d at 1145 (citing United

States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003); Terry, 392 U.S. at 20).  As the

Eighth Circuit explained:

> A consensual encounter does not implicate the Fourth
> Amendment. United States v. Hathcock, 103 F.3d 715, 718
> (8th Cir. 1997).  "Law enforcement officers do not violate the
> Fourth Amendment's prohibition of unreasonable seizures
> merely by approaching individuals on the street or in other
> public places and putting questions to them if they are willing
> to listen." United States v. Vera, 457 F.3d 831, 834 (8th Cir.
> 2006), quoting United States v. Drayton, 536 U.S. 194, 200,
> 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). "Mere police
> questioning does not constitute a seizure." United States v.
> Barry, 394 F.3d 1070, 1074 (8th Cir. 2005), quoting Florida
> v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d
> 389 (1991); Hathcock, 103 F.3d at 719; United States v.
> Slater, 411 F.3d 1003, 1005 (8th Cir. 2005).  A consensual
> encounter becomes a seizure implicating the Fourth
> Amendment when, considering the totality of the
> circumstances, the questioning is "so intimidating,
> threatening, or coercive that a reasonable person would not
> have believed himself free to leave." Hathcock, 103 F.3d at
> 718, quoting United States v. McKines, 933 F.2d 1412, 1419
> (8th Cir. 1991) (en banc); see also [United States v.]
> Johnson, 326 F.3d [1018] [ ] 1021 [8th Cir. 2003]; INS v.
> Delgado, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247
> (1984).
>
> ***
>
> This court considers the totality of the circumstances, "not
> one particular detail," to determine whether a seizure
> occurred.  See Johnson, 326 F.3d at 1022.  Factors
> indicating a seizure are: the presence of several officers, a
> display of a weapon by an officer, physical touching of the
> person, or the "use of language or tone of voice indicating
> that compliance with the officer's request might be
> compelled." Hathcock, 103 F.3d at 718–19, quoting United
> States v. White, 81 F.3d 775, 779 (8th Cir.1996); Barry, 394
> F.3d at 1075.  A seizure occurs when the officer, "by means
> of physical force or show of authority, has in some way

restrained the liberty" of a suspect.   Id. at 1074, quoting
Terry, 392 U.S. at 19.

Id. at 1145.

For a Terry stop, "where a police officer observes unusual conduct which leads

him reasonably to conclude in light of his experience that criminal activity may be afoot,

the officer may briefly stop the suspicious person and make reasonable inquiries aimed

at confirming or dispelling his suspicions." United States v. Zamora–Lopez, 685 F.3d

787, 789 (8th Cir. 2012) (quoting Minnesota v. Dickerson, 508 U.S. 366, 372–73, 113

S.Ct. 2130, 124 L.Ed.2d 334 (1993) (quoting Terry, 392 U.S. at 30) (internal marks

omitted)).  "A reasonable suspicion is a particularized and objective basis for suspecting

criminal activity by the person who is stopped."  United States v. Hightower, 716 F.3d

1117, 1119–20 (8th Cir. 2013) (quotation omitted).  "In determining whether reasonable

suspicion exists, [courts] consider the totality of the circumstances in light of the officers'

experience and specialized training."  United States v. Preston, 685 F.3d 685, 689 (8th

Cir. 2012) (quotation omitted).

As for searches of a person, the Fourth Amendment guarantees "the right of the

people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "Subject to a few

narrow exceptions, a warrantless search or seizure violates the Fourth Amendment."

Zamora–Lopez, 685 F.3d at 789; Preston, 685 F.3d at 689 ("The Fourth Amendment

forbids unreasonable searches and seizures and usually requires police to obtain a

warrant before conducting a search.") (citing United States v. Roggeman, 279 F.3d 573,

577 (8th Cir. 2002) (citations omitted)).

One exception to the warrant requirement that permits a limited search of a person is if "there is a reasonable suspicion that the suspect is armed and poses a danger to officers or others." Preston, 685 F.3d at 689 (citing Terry, 392 U.S. at 29, 88 S.Ct. 1868); United States v. Cotter, 701 F.3d 544, 547 (8th Cir. 2012) ("In addition, if the officer reasonably believes the person with whom he is dealing is armed and dangerous, he is permitted to conduct a protective search of the person's outer clothing, and any weapons seized as the result of such a search 'may properly be introduced in evidence against the person from whom they were taken.'"); United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008) ("'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a patdown search 'to determine whether the person is in fact carrying a weapon.'") (quoting Dickerson, 508 U.S. at 373, quoting Terry, 392 U.S. at 24).

"Consent to search is [another] such exception, and '[a] warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search.'" United States v. Sanders, 424 F.3d 768 (8th Cir. 2005) (quoting United States v. Brown, 763 F.2d 984, 987 (8th Cir.1985)).

A third exception to the warrant requirement[3] is that warrantless searches of an arrestee's person, including personal property contained in his pockets, are valid as a

---

[3]     Other well-recognized exceptions to the warrant requirement (but not germane to this case) are the exigent circumstances and plain view doctrines. See Kentucky v. King, 131 S.Ct. 1849, 1856-58 (2011).

search incident to arrest.[4] <u>Riley v. California</u>, --- S.Ct. ----, 2014 WL 2864483, at *7 (June 25, 2104) (citing <u>United States v. Robinson</u>, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973)).  "As the [<u>Robinson</u>] Court explained, '[t]he authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect.' Instead, a 'custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.'" <u>Id.</u> (quoting <u>Robinson</u> at 235).

As a general rule "[i]f, ... the officers conduct an illegal search or detention, physical evidence from the search as well as verbal evidence obtained from the detention must be excluded as the 'fruits' of the officers' unlawful action. <u>Cotter</u>, 701 F.3d at 547 (citing <u>Wong Sun v. United States</u>, 371 U.S. 471, 484–85, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).  On the other hand, if the government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [then] the evidence should be received." <u>United States v. Allen</u>, 713 F.3d 382, 387 (8th Cir. 2013) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)).  "For that exception to apply the government must show (1) a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) an active

---

[4]  "[T]he label 'exception' is something of a misnomer in this context, as warrantless searches incident to arrest occur with far greater frequency than searches conducted pursuant to a warrant." <u>Riley</u>, 2014 WL 2864483, at *7 (citing 3 W. LaFave, Search and Seizure § 5.2(b), p. 132, and n. 15 (5th ed. 2012)).

pursuit of a substantial, alternative line of investigation at the time of the constitutional violation." Id. (citing United States v. Conner, 127 F.3d 663, 667 (8th Cir.1997)).

Ultimately, the burden is on the Government to justify a warrantless search. United States v. Madrid, 152 F.3d 1034, 1037 (8th Cir. 1998).

The Court now applies these principles to the motion at hand.  However, before addressing the substance of defendant's motion, the Court shares a couple of observations.  First, defendant never clarified what effect suppressing the seizure of his wallet has on any issue in this case.  Defendant was arrested after he stated that he name was German Valenzuela, not Jose Soto, and when it was discovered that there was an outstanding warrant for his arrest.  Defendant has been charged with illegal re-entry after removal and the central fact of the motion is defendant's identity.  The Supreme Court has stated that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest." INS v. Lopez–Mendoza, 468 U.S. 1032, 1039 (1984); cf. United States v. Ceccolini, 435 U.S. 268, 279–80, 98 (1978) (holding that suppression of witness testimony was not required when the government learned the witness's identity by means of an illegal search); Puc-Ruiz v. Holder, 629 F.3d 771, 777 (8th Cir. 2010) (citing Lopez-Mendoza and stating that evidence of identity is not suppressible, though evidence of alienage in a deportation case is).  Therefore, even if the Court recommended suppressing the wallet, as defendant's identity was discovered via other means and is not suppressible in any event, the Court is at a loss to understand the impact of suppression of the wallet in this case.

Second, the Government did not address the question of the reasonableness of the officer's warrantless seizure of the wallet, and seemed to suggest that the seizure was all part and parcel of what it contended was a consensual encounter. Officer Nelson testified that the wallet was "recovered," (Tr. 17), and his report stated that the wallet was "retrieved." Def. Ex. 1. Neither the Government nor defendant elicited any testimony from Officer Nelson that shed any light on the facts surrounding the seizure of the wallet. Thus, for the purpose of addressing defendant's motion, the Court will not presume that the wallet was taken with his consent.

With these observations in mind, as a preliminary matter the Court agrees with the Government that at the outset the encounter between defendant and the officers was consensual. There was no evidence that the initial encounter in the parking lot was "so intimidating, threating or coercive that a reasonable person would not have believed himself free to leave." Hathcock, 103 F.3d at 718 (citation omitted). The officers did not have their weapons drawn, there was no evidence that they threatened or intimidated defendant, and the only evidence was that they asked defendant to identify himself. This appears not to have been an unusual occurrence in a high crime area at a housing complex that often employed its own security and off-duty officers. (Tr. 13). As a result, the Fourth Amendment was not implicated in this initial encounter.

However, that finding does not require the determination that seizure of defendant's wallet was valid.

At the hearing, the only evidence adduced was the following: Officers Nelson and Martin were sent to a high crime area where defendant was encountered because of a call of a suspicious person in the vicinity. Following their encounter with defendant

in the parking lot, where defendant was observed taking out trash, Officer Nelson asked

defendant for identification, defendant seemed "nervous" and stated that he had no

identification.   But Officer Nelson could plainly see that defendant had a wallet in his

pocket and had a strong suspicion that the wallet would contain identification.   After

realizing that defendant was probably lying to him about the identification, Officer

Nelson seized the wallet.   This all took place <u>before</u> the officers determined that

defendant's name was German Valenzuela.   Officer Martin ran this name through his

computer system and discovered an outstanding warrant for defendant's arrest for a

ticket, and then defendant was arrested.   The Government did not argue that the

encounter with defendant in the parking lot <u>prior to the retrieval of the wallet</u> amounted

to a <u>Terry</u> stop, nor on these facts would the Court find it was one.   <u>See</u> <u>e.g.</u> <u>Hughes</u>,

517 F.3d at 1015-18.[5]   Likewise, there was no testimony that defendant agreed to hand

---

[5]      In <u>Hughes</u>, the Eighth Circuit found that the following facts did not constitute a <u>Terry</u> stop, and consequently reversed the district court's holding that the pat-down of defendant following the stop was valid.

> On August 11, 2005, at about 9:31 a.m., a Kansas City police officer was dispatched to an apartment complex on a call of 'suspicious parties on the property,' in response to an anonymous complaint. The complex is in a high crime area, due to reputed narcotics trafficking.  Dispatch described the parties as two black males, one without a shirt, the other wearing a brown shirt and having braids.  Dispatch also mentioned a red bicycle. When the officer arrived, he observed Hughes, another male, and a female standing a few feet from a bus stop across the street from the apartment complex.  The officer did not recall seeing a bicycle.  Hughes and the other male fit the description given by dispatch. The officer stopped all three, questioned what they were doing in the area, then frisked them.  The officer felt hard cylindrical objects in one of Hughes's pockets, which he removed and determined were live rounds of ammunition.

> At some point the officer did a computer check indicating that Hughes had no warrants, but was under supervision for domestic assault and affiliated

over his wallet (having denied he had one on his person) or that the wallet was retrieved pursuant to a Terry stop pat-down for the purpose of insuring that defendant was not armed.[6]  On this basis, the Court concludes that there are no exceptions which save this warrantless retrieval of the wallet.

But again, that determination does not end the Court's analysis of defendant's motion.   As already noted, there is no evidence in the record to suggest that the discovery of the name German Valenzuela, which led to the discovery of the outstanding warrant for defendant's arrest, was the fruit of the illegal seizure of his wallet.  The Court does not know how Officer Martin determined that defendant's name was German Valenzuela, except there is nothing in the record to suggest that it came from information contained in defendant's wallet.  At any rate, what the Court does know is that following the discovery of defendant's name by Officer Martin, he was arrested

---

with a gang in Omaha, Nebraska. There was conflicting evidence about when the check occurred.  The officer prepared two reports, one stating that the check occurred before the frisk, and the other that it occurred after.  The officer testified he had no specific recollection of the sequence of events. The district court did not make a finding as to the time of the check, explicitly noting that the "timing of the computer check is not clear."

*** 

The district court found reasonable suspicion to justify a Terry stop because: (1) the area was a high crime area, and (2) Hughes matched the description given by dispatch. The officer testified that before he approached, Hughes and the others were standing near a bus stop, and were not engaged in any suspicious activity. Neither the district court nor the government points to any facts that support a reasonable suspicion that a crime was currently taking, or about to take, place.

517 F.3d at 1015-16 (citations omitted).

[6]     The Government's contention that at the point defendant admitted his name was German Valenzuela the encounter converted to a Terry stop is irrelevant.   When defendant made this admission, the wallet had (a) already been seized, and (b) the "retrieval" was not pursuant to a Terry patdown for arms.

based on an outstanding warrant for his arrest.   At that point, a full search of defendant's person was warranted.   Thus, the Court finds that while the wallet was seized prior to defendant's arrest, it inevitably would have been discovered and seized pursuant to a valid search of his person, incident to arrest.

Finally, the Court is satisfied that where, as here, defendant had given the officers false information regarding his name, which is a crime, the officers would have investigated the contents of his wallet to discover any additional information bearing on his true identity.  Allen, 713 F.3d at 387.  As the United States Supreme Court just confirmed in Riley, while a warrantless search of a cell phone incident to a valid arrest violates the Fourth Amendment, the warrantless search of the contents of a wallet does not.  2014 WL 2864483, at *13 ("Lower courts applying Robinson . . . have approved searches of a variety of personal items carried by an arrestee." Id., at *13 (citing United States v. Carrion, 809 F.2d 1120, 1123, 1128 (5th Cir. 1987) (billfold and address book); United States v. Watson, 669 F.2d 1374, 1383–1384 (11th Cir. 1982) (wallet); United States v. Lee, 501 F.2d 890, 892 (D.C. Cir. 1974) (purse)); see also United States v. Armstrong, 16 F.3d 289, 294 (8th Cir. 1994) (affirming warrantless search of wallet incident to arrest); United States v. Molinaro, 877 F.2d 1341, 1347 (7th Cir. 1989) (citing numerous cases upholding warrantless searches of an arrestee's person, including the contents of a wallet, as a search incident to arrest).

In summary, while no facts were presented to the Court to establish that any of the exceptions to the warrant requirement applied to the initial seizure of defendant's wallet, the wallet would have been inevitably discovered, seized and searched in connection with the search of defendant, incident to a valid arrest.  For all of these

reasons, the Court concludes that the officer's actions did not violate the Fourth Amendment, and defendant's motion to suppress should be denied.

## III.   RECOMMENDATION

For the reasons set forth above, it is recommended that Defendant's Motion to Suppress Fruits of Unlawful Search and Seizure [Docket No. 17] be **DENIED.**


Dated:  June 30, 2014                           *Janie S. Mayeron*
                                                JANIE S. MAYERON
                                                United States Magistrate Judge


## NOTICE

Under D. Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 14, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.  Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before